## THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

FETHEROLF, LLC and WEST MESA REAL
ESTATE HOLDING COMPANY, LLC

        Plaintiffs,

    vs.                             No. 2:24-cv-00142-WJ-GBW

STATE FARM FIRE AND CASUALTY
COMPANY, a foreign corporation,

        Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT IN PART

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment, Fed. R. Civ. P. 56, on Plaintiffs' claims and Defendant's counterclaim. **[Docs. 43, 44].** Plaintiffs Fetherolf, LLC (Fetherolf) and West Mesa Real Estate Holding Company, LLC (West Mesa) assert that they are owed defense and indemnity coverage under a State Firm Fire and Casualty Company (State Farm) insurance policy in connection with their response to a New Mexico Environmental Department (NMED) Notice of Discharge alerting Plaintiffs to above-regulation concentrations of Chlorinated Volatile Organic Compounds (CVOCs) in the vadose zone underlying their property. Defendant State Farm in turn seeks summary judgment on the ground that the relevant insurance policy does not provide coverage for Plaintiffs' claims. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

I.    **BACKGROUND**

A.  **NMED NOTICE & PLAINTIFFS' INVESTIGATION AND REMEDIATION OF THE SITE**

The undisputed facts are as follows.  West Mesa owns a .11-acre property at 3002 Monte Vista Boulevard Northeast, Albuquerque, New Mexico (Site).  Fetherolf operates a drycleaning business, known as "Albuquerque Cleaners" or "ABQ Cleaners," at the Site.  In June 2022, the New Mexico Environmental Department's (NMED) Ground Water Quality Bureau (GWQB), collected four subsurface vapor samples from a City of Albuquerque public right-of-way at the Site for analysis of Volatile Organic Compounds (CVOCs).  It found concentrations of water contaminants in magnitudes sufficient to trigger a need for abatement under New Mexico Water Quality Control Commission (NMWQC) regulations.

Based on the results of GWQB's study, on August 17, 2022, the NMED issued a "Notice of Discharge" (Notice) to Fetherolf, LLC managing member Josala Fetherolf providing that GWQB's sampling "indicate[s] the presence of Tetrachloroethene (PCE) and Trichloroethene (TCE) in the vadose zone[1] in excess of their respective NMED Vapor Intrusion Screening Level (VISL)."[2]  Ex. 1.  The Notice states, "NMED concludes that an unauthorized discharge of CVOCs to the vadose zone has occurred in sufficient quantities that is [sic] detrimental to human health, animal or plant life, property, or may unreasonably interfere with public welfare or the use of property."  *Id.*  Therefore, the NMED determined "pursuant 20.6.2 NMAC, the Site requires further assessment and remediation to be protective of public health and the health of Site employees."  *Id.*  Given the magnitude of the discharge, the NMED determined "immediate action"

_____

[1] The vadose zone is the area between the ground surface and the water table. *See* Ex. 1.

[2] VISLs are defined by the New Mexico Environment Department, *Risk Assessment Guidance for Site Investigations and Remediation* I (Nov. 2022), Table A4.

was necessary.  *Id.*  The Notice instructed Fetherolf to submit a "Corrective Action Plan," a "Voluntary Abatement Plan," and an application for a voluntary remediation agreement.  *Id.*

The Notice cites NMWQC regulations regarding mandatory environmental remediation. *See id.* (citing 20.6.2 NMAC).  Pursuant to these regulations, "[t]he vadose zone shall be abated as follows . . . . water contaminants in the vadose zone shall not be capable of contaminating ground water or surface water, in excess of [NMWQC] standards . . . through leaching, percolation or as the water table elevation fluctuates."  20.6.2.4103(A)(1) NMAC.  NMWQC abatement regulations also provide, "any constituent listed in 20.6.2.3103 NMAC or any toxic pollutant in the vadose zone shall be abated so that it is not capable of endangering human health due to inhalation of vapors that may accumulate in structures, utility infrastructure, or construction excavations."  *Id.* 20.6.2.4103(A)(2); *see id.* 20.6.2.3103 (listing "contaminants" including PCE and TCE).

Fetherolf retained two environmental services firms to undertake investigative and remedial efforts on its behalf.  On November 9, 2022, the first firm (Firm One) conducted an inspection of the site that included the interior of the site building, the basement, the storage of dry-cleaning equipment and products, and "the ambient air."  Ex. 4.  Firm One also placed "samplers" at various locations within the site building to test air and soil quality.  *Id.*  At the conclusion of the two-week testing period, the indoor air samples were found to "contain[] concentrations of PCE and TCE in excess of industrial VISLs."  *Id.* at 8.  The soil gas samples contained concentrations of PCE above the NMED VISL.  One soil gas sample contained TCE at a concentration greater than the applicable NMED VISL; another contained TCE at a concentration below the applicable NMED VISL.  *Id.*

On or about January 10, 2023, Firm One submitted a report to GWQB describing the results of its analysis and its proposed remediation recommendations. The report states: "A release of [CVOCs] in the vadose zone was discovered at the site during a subsurface vapor investigation conducted in June 2022 on City of Albuquerque public rights-of-way along the north and west site boundaries." Ex. 4. It further recounts the results of four "passive soil samples" placed along the north and west site boundaries: each contained concentrations of CVOCs "in excess of NMED Vapor Intrusion Screening Levels (VISL)." *Id.* The report recommends certain remediation measures, including "repair of the dry-cleaning system," "improvements in housekeeping to minimize the release of CVOCs," and "increased ventilation." *Id.* NMED accepted the report on February 10, 2023.

The second firm (Firm Two) conducted two physical visits of the property. Ex. 6, at 2. Firm Two's investigation revealed "a release of PCE beyond the boundaries of the facility and in the groundwater." Doc. 55, at 5. Specifically, Firm Two's testing revealed "an exceedance of sub-slab VISLs under the basement of" a neighboring property and PCE levels exceeding "indoor air standards" in the basement of the building located on that property. *Id.* PCE levels inside the building were found to be "below the industrial indoor air standard, but above the residential standard." *Id.* Plaintiffs allege that these facts "indicat[e] an off-site release into" the neighboring property. *Id.*

On April 18, 2023, Firm Two submitted a Corrective Action Progress Report to NMED on behalf of ABQ Cleaners. Ex. 6. The report summarized corrective measures "observed to have been completed or underway." *Id.* The report also recommended certain "best management practices" and stated that Fetherolf had advised DBS&A of plans to remove and replace the current dry cleaning plant with a "modern plant employing alternative cleaning agents." *Id.*

On October 3, 2023, through counsel, Fetherolf submitted a notice of claim to State Farm alerting State Farm to the Notice and requesting defense and indemnity coverage based on the Notice's underlying "property damage claim." Ex. 8. State Farm responded to Fetherolf on November 16, 2023, indicating that after review of the claim, a question remained regarding State Farm's obligation to defend or indemnify Fetherolf in light of the pollution exclusion. Ex. 9. On January 17, 2024, State Farm advised Fetherolf's counsel that State Farm would "accept Fetherolf's tender" and that it would "accept billings from the date of the tender letter, October 3, 2023, and forward." Ex. 10.

On April 29, 2024, State Farm issued a supplemental reservation of rights letter to Fetherolf intending to "update and replace" the November 16 letter. Ex. 11. The letter provides that State Farm "accept[s] defense of the claim made against Fetherolf LLC by the New Mexico Environment Department subject to a full reservation of rights" and agrees to "accept and reimburse" defense fees incurred by Fetherolf as of October 3, 2023, subject to the applicability of the Policy's exclusions for pollution and damage to property owned by the insured. The letter also "reserves [State Farm's] rights as to reimbursement of any investigative or remediation expenses made as voluntary payments without [State Farm's] consent." *Id.*

### B. THE POLICY

The relevant Businessowners Policy (policy number 91-BK-X726-3), was issued to Fetherolf, LLC, for a policy period of October 15, 2021 to October 15, 2022 (Policy). *See* Ex. 7. The Policy contains business liability coverage under Section II – Liability, Coverage L – Business Liability, which provides indemnity for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury', 'property damage' or 'personal and advertising

injury'." *Id.* at 57. "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property." *Id.* at 70.

The Policy also provides that State Farm has "the right and duty to defend the insured by counsel of our choice against any 'suit' seeking those damages," although State Farm has "no duty to defend the insured against any 'suit' seeking damages for 'bodily injury', 'property damage' or 'personal and advertising injury', to which the insurance does not apply." *Id.* The Policy states, in relevant part, that State Farm "will pay, with respect to any claim we investigate or settle, or any 'suit' against an insured we defend . . . [a]ll expenses we incur." *Id.*

The Policy contains certain enumerated exclusions to business liability coverage, including an exclusion for damage or losses resulting from pollution (Absolute Pollution Exclusion). *Id.* at 59; *See* Mot. 19; Response, Doc. 55, at 17. The Absolute Pollution Exclusion provides that business liability insurance does not extend to:

> a)  "[b]odily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, spill, release or escape of "pollutants" . . . . [a]t or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured; or
>
> b)  [a]ny loss, cost or expense arising out of any:
>
>> 1)  [r]equest, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or
>>
>> 2)  [c]laim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Ex. 7 at 60.

The Policy defines "[p]ollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.* at 70. Subparagraph b, *infra*, does not apply to "liability for damages because of 'property damage' that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement or such claim or 'suit' by or on behalf of a governmental authority." *Id.* at 60. In accordance with the parties' practices, this exception shall be referred to as the Alternative Liability Provision. *See* Doc. 55, at 19–20; Doc. 59, at 9.

The parties invoke two additional exceptions to State Farm's coverage obligations under the Policy, which the parties refer to as (i) the Voluntary Payments Clause and (ii) the Damage to Property Exclusion. The so-called Voluntary Payments Clause provides: "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." Ex. 7. at 68. The Damage to Property Exclusion excludes coverage for "[p]roperty damage" to "[p]roperty you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property[.]" *Id.* at 61.

## C.  THE ISSUES ON SUMMARY JUDGMENT

On February 12, 2024, Plaintiffs filed suit in this Court, asserting that State Farm breached its contract due to an alleged failure to defend and indemnify Fetherolf and West Mesa for costs incurred in responding, investigating, and remediating the Site in response to the Notice (Count I).

**[Doc. 1]**.  The Complaint also seeks a declaratory judgment that State Farm owes defense and indemnity coverage relating to the damages alleged in the Notice (Count IV).  *Id.*[3]

In its Motion, State Farm seeks a declaratory judgment that the Policy does not provide coverage for any costs related to the Notice.  State Farm asserts that the Policy imposes on it no duty to indemnify or defend Plaintiffs against NMED's claims in this instance because: West Mesa is not an insured under the State Farm policy; NMED's action does not qualify as a "suit" against the insured; and the Absolute Pollution Exclusion and/or the Damage to Property Exclusion apply to exclude coverage.  Mot. at 2.  State Farm also seeks reimbursement of defense costs it has already expended on Plaintiffs' behalf prior to Plaintiff providing notice to State Farm of the claim, on the ground that these were voluntary payments, alleviating State Farm of its duty to provide coverage under the Policy.

Plaintiffs contend that State Farm has failed to show that there is no genuine issue of material fact concerning Plaintiffs' entitlement to defense and indemnification under the Policy.  Specifically, Plaintiffs assert they are insured under the Policy; NMED's remediation demand qualifies as a "suit" under the Policy; and neither the Absolute Pollution Exclusion nor the Damage to Property Exclusion exclude coverage.  *See* Doc. 55.  Plaintiffs also maintain that the Voluntary Payments Clause does not apply to bar State Farm's duty to defend or indemnify.

## II.  DISCUSSION

### A.  FED. R. CIV. P. 56 STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[3] The remaining counts in the Complaint have been voluntarily dismissed.  *See* Doc. 6.

Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Est. of Beauford v. Mesa Cnty., Colo.*, 35 F.4th 1248, 1261 (10th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, but once the moving party has done so, the burden shifts to the non-movant to establish a genuine issue of fact." *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1197 (10th Cir. 2022). The movant may satisfy its initial burden by "producing affirmative evidence negating an essential element of the nonmoving party's claim." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). In opposing summary judgment, the non-movant "must bring forward specific facts showing a genuine issue for trial." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citation omitted). "The summary judgment standard requires [the Court] to construe the facts in the light most favorable to the non-movant and to draw all reasonable inferences in its favor." *Est. of Beauford*, 35 F.4th at 1261. The Court's function at this stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

## B.  APPLICABLE LAW

In diversity suits, a district court's "task is . . . simply to ascertain and apply the state law." *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007) (cleaned up). In this case, the Court applies New Mexico's substantive law. To that end, the Court "must follow the most recent decisions of the state's highest court." *Id.* "Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." *Id.* (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)). In arriving at its prediction,

the Court may draw on decisions of lower courts in New Mexico, appellate decisions in states with similar laws, district court decisions interpreting New Mexico law, and "'the general weight and trend of authority' in the relevant area of law." *Id.* (quoting *MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1262 (10th Cir. 2006)). "Ultimately, however, the Court's task is to predict what the state supreme court would do." *Id.*

"The obligation of the insurer is a question of contract law and [is] determined by reference to the terms of the insurance policy." *Knowles v. United Servs. Auto. Ass'n*, 832 P.2d 394, 396 (N.M. 1992). New Mexico recognizes that insurance contracts tend to be contracts of adhesion, and "has developed principles of construction that favor both the insured and the avowed purpose of insurance, the provision of coverage." *Sanchez v. Herrera*, 783 P.2d 465, 469 (N.M. 1989). However, "[a]s with other contracts, where an insurance policy's terms 'have a common and ordinary meaning, that meaning controls in determining the intent of the parties.'" *United Nuclear Corp. v. Allstate Ins. Co.*, 285 P.3d 644, 647 (N.M. 2012). "If the contract is unambiguous, the court is bound to enforce its terms." *Sanchez*, 783 P.2d at 469.

"A clause in an insurance policy is ambiguous if it is 'reasonably and fairly susceptible of different constructions.'" *Knowles*, 832 P.2d at 396 (quoting *Sanchez*, 783 P.2d at 469). "Exclusionary clauses in insurance policies are to be narrowly construed, with the reasonable expectations of the insured providing the basis for [the court's] analysis." *Id.* (citations omitted). If a clause is found to be ambiguous, the Court must interpret the clause in favor of the insured. *Id.*

### C.  IT IS UNDISPUTED THAT WEST MESA IS NOT AN INSURED UNDER THE POLICY AND THAT 2021-2022 IS THE RELEVANT POLICY PERIOD

Defendant seeks summary judgment that West Mesa is not an insured under the Policy.  Mot. at 13-14.  Plaintiffs do not appear to contest this fact in their brief in response to Defendant's Motion.  *See* Response, at 9–10.  Indeed, although the relevant section of their brief is titled "*Plaintiffs* are *insureds* under the subject policy," Plaintiffs state that it is "Fetherolf" who is "*the* named insured" under the Policy" and is therefore the entity "entitled to defense and indemnity coverage" and that "remains responsible for the costs of retaining environmental consultants . . . to investigate and remediate the Site."  *Id.* (all emphasis added).  Seeing no issue of disputed fact, the Court grants summary judgment on the claim that West Mesa is not an insured under the Policy.  To the extent State Farm seeks a declaratory judgment that 2021-2022 is the only "implicated policy period," Plaintiffs also do not appear to contest that fact.  Therefore, the Court determines that summary judgment is warranted on this claim as well.

### D.  THE ABSOLUTE POLLUTION EXCLUSION UNAMBIGUOUSLY PRECLUDES COVERAGE FOR PROPERTY DAMAGE ARISING FROM THE INSURED'S RESPONSE TO A NMED DEMAND

The New Mexico Supreme Court has not addressed whether an absolute pollution exclusion, like the exclusion in the Policy, unambiguously precludes indemnity and defense coverage in connection with remedial measures taken in response to a NMED Notice of Discharge.  Therefore, guided by the authorities set forth in *Wade*, 483 F.3d at 665, the Court's task is to predict how the Supreme Court would rule on the question.  Plaintiffs base their prediction that the New Mexico Supreme Court would find the absolute pollution exclusion to be ambiguous almost entirely on this Court's decision in *Chisholm's*. *Chisholm's Village Plaza, LLC v. Travelers Commercial Ins. Co.*, 621 F. Supp. 3d 1195, 1242 (D.N.M. 2022), *rev'd*, No. 23-2133, 2025 WL

1178099 (10th Cir. 2025) (applying New Mexico law).  As of April 23, 2025, however, that decision is no longer good law.  *See* 2025 WL 1178099, at *13.

Relying on *Chisholm's*, 621 F. Supp. 3d at 1195, Plaintiffs assert that the absolute pollution exclusion is ambiguous per se and that the policy's definition of pollutants is unclear. Doc. 55 at 18.  Plaintiffs further contend that because drycleaning solvents are employed in the everyday operations of drycleaning, interpreting the Policy in a way that precludes coverage for damage resulting from those chemicals would defeat the reasonable expectations of the insured. *Id.* at 19.  The ordinary meaning of the Policy's terms fails to sustain Plaintiffs' arguments.

Plaintiffs' assert the Policy's definition of "pollutants," is deficient insofar as it "does not define which substances constitute 'pollutants' within the meaning of the Policy, or list PCE or TCE" in particular as "pollutants."  *Id.*   But the omission of a particular item from a category does not render the category ambiguous or create uncertainty regarding whether an item qualifies as a member of the category.  *Battishill v. Farmers Alliance Ins. Co.*, 127 P.3d 1111, 1113 (N.M. 2006) ("[A]n insurance policy is not rendered ambiguous merely because a term is not defined; rather, the term must be interpreted in its usual, ordinary, and popular sense.").  Indeed, contracts rarely list every possible meaning of a term.  Requiring an exhaustive list as such would be unworkable and lead to unbearably long definitions sections.  *See Millers Cas. Ins. Co. of Tex. v. Flores*, 876 P.2d 227, 231 (N.M. 1994) ("[I]t would be unreasonable to require [the insurer] to provide an exhaustive list of noncovered activities . . . in order for the clause to be considered unambiguous.").  Indeed, the Policy's definition of "pollutants" includes no mention of any specific pollutant.  Therefore, according to Plaintiffs' argument, no substance could qualify as a "pollutant," a result plainly not contemplated by the contracting parties.   Plaintiffs' interpretation would therefore lead to unreasonable results.

Moreover, barring the drafting issues that would arise from Plaintiffs' proposed definitional approach, the definition of "pollutants" does not create any question whether TCE and PCE are in fact pollutants under the Policy. TCE and PCE "vapor[s]" were found to have contaminated the Site. Indeed, Plaintiffs' counsel resorted to language consistent with the Policy's definition in their notice to Defendant: "This is to place State Farm Insurance on notice of a property damage claim . . . which directed Fetherolf to investigate and remediate chlorinated solvent *contamination* at this Site." Ex. 8 (emphasis added). It is popularly understood that pollutants, such as CVOCs, contaminate the environment.

Plaintiffs' alternative approach to asserting ambiguity derives from the Policy's failure to explain "how" a substance must function as a "contaminant" or an "irritant." Yet, one can imagine how requiring such exacting granularity in a standardized insurance contract may well yield more confusion than clarity. The Court need not look further than the dictionary definition to ascertain the ordinary meaning of those terms. *Vihstadt v. Travelers Ins. Co.*, 709 P.2d 187, 188 (N.M. 1985) ("[W]ords, phrases or terms will be given their ordinary meaning.") (citation omitted)); *Battishill*, 127 P.3d at 1113 (the "common and ordinary meaning" of terms "may be ascertained from a dictionary"). Webster's Third defines "contaminant" as "something that contaminates." *Contaminant*, Webster's Third New International Dictionary (1993) ("Webster's Third"). In turn, "contaminate" is defined as "to soil, stain, corrupt, or infect by contact or association," "make inferior or impure by mixture" or "pollute." *Contaminate*, Webster's Third. Similarly, "irritant" is defined as "an agent by which irritation is produced," as in, "a chemical

irritant." *Irritant*, Webster's Third.  Irritants and contaminants are clear on their face and not made ambiguous because the Policy does not specify in what "manner" substances must act as such.[4]

Regardless of what type of pollutant PCE and TCE are, it is not reasonably debatable whether the chemicals were alleged to have "contaminated" the soil in this case.  Again, Plaintiffs themselves described the issue in this manner when they notified State Farm that NMED had instructed them to "investigate and remediate chlorinated solvent contamination at [the] Site." Ex. 8.  The Notice underlying Plaintiffs' claim explained that "[v]apor intrusion" as indicated by "the presence of [PCE] and [TCE]" here, is "the process by which volatile chemicals residing in contaminated soil or groundwater off-gas vapors that migrate upward and into overlying structures."  Ex. 1.  Based on the "soil vapor samples" containing above-VISL magnitudes of TCE and PCE, the NMED "conclude[d] that an unauthorized discharge of CVOCs to the vadose zone has occurred in sufficient quantities that is [sic] detrimental to human health, animal or plant life, property, or may unreasonably interfere with public welfare or the use of property."  Adopting a plain reading, it would be unreasonable to conclude that the CVOCs were not alleged to have contaminated the soil in this instance.  Moreover, NMWQC includes PCE and TCE in its regulations applicable to ground water "contaminants."  20.6.2.3103 NMAC.  Therefore, regardless of whether TCE or PCE constitute "pollutants" under the Policy, they unambiguously functioned as contaminants, precluding coverage under the Policy.[5]

---

[4] By analogy, a homeowner's policy that precludes coverage for pest invasion is not ambiguous because it does not specify in what manner the pests must intrude on the premises.  Like pest invasion, environmental pollution is a concept with a common understanding.

[5] The Court's interpretation aligns with the Tenth Circuit's recent analysis in *Chisholm's-Village*, 2025 WL 1178099.  There, the Court, found that pursuant to New Mexico law, an absolute pollution exclusion unambiguously excluded coverage for claims arising out of a CERCLA complaint alleging that a drycleaning business that had historically occupied the insured's property

Plaintiffs' argument that the absolute pollution exclusion serves to preclude a likely source of liability for drycleaning businesses, who use potentially polluting chemicals in their day-to-day operations, bears some logical weight. Because the use of (potentially polluting) chemicals is central to their business, Plaintiffs argue that interpreting the absolute pollution exclusion in State Farm's favor would defeat their reasonable expectation that the insurance policy they purchased would cover damage resulting from that use. In support of their argument, Plaintiffs cite a principle of New Mexico law that "[w]hen deciding whether an exclusionary clause is effective to nullify coverage under an insurance policy, [courts] give consideration to the reasonable expectations of the insured." *See* Doc. 55 at 19 (quoting *Barth v. Coleman*, 878 P.2d 319, 323 (N.M. 1994)). The case that principle originates from, however, demonstrates that it does not compel the result Plaintiffs seek.

In *Barth*, the insured alleged that he had specifically requested premises liability coverage that included "assaults and batteries" on the premises but, as it turned out, assault and battery were excluded from the policy. 878 P.2d at 320. The insured obtained surplus lines insurance via "a series of intermediaries," and the intermediary the insured dealt with "never explained what surplus lines insurance was, never discussed the risks associated with purchasing

---

"'released' hazardous substances into the soil and 'contaminated' water at the site." *Id.* at *2, 5–8. The absolute pollution exclusions examined in *Chisholm's* are materially like the one at issue in the Policy. Like the Policy, one of the policies at issue there excluded "'property damage' arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants . . . [a]t or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured." *Id.* At *2. The policy defined pollutants as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste." *Id.* Relying on the common and ordinary understanding of "contaminant," the Court found the exclusion "unambiguously preclude[d] coverage of damage arising from alleged released contaminants," as the CERCLA complaint alleged in that case. *Id.* at *9.

such insurance, and never revealed how the surplus lines system worked." *Id.* at 324.   Thus, "[t]hroughout th[e] transaction, [the insured] was left uninformed about the nature of what he was purchasing, how the policy was being procured, and which company he was purchasing the policy from."   878 P.2d at 324.   For those reasons, the court found that "the particular insurance transaction . . . gave rise to a reasonable expectation that the policy issued" would conform to the terms requested by the insured.   *Id.*   Here, as explained, the clear language of the Policy is inconsistent with a reasonable expectation that property damage resulting from chemical pollution is covered.   And Plaintiffs have not suggested that they specifically requested pollution coverage or were uninformed about the terms of the Policy when they purchased it.   Therefore, *Barth* does not support Plaintiffs' cause.

### i.   The Alternative Liability Provision Does Not Vitiate the Absolute Pollution Exclusion

The Alternative Liability Provision provides no additional support.   The Alternative Liability Provision creates an exception to subparagraph b of the Absolute Pollution Exclusion for "liability for damages because of 'property damage' that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement or such claim or 'suit' by or on behalf of a governmental authority."   Ex. 7 at 60; *see also infra*, I. B.   Plaintiffs assert that "[b]ecause the releases at issue impact other properties they could subject West Mesa or Fetherolf to common law liability for nuisance or trespass, independent of any NMED demand or suit to respond [sic] the effects of the PCE release."   Doc. 55 at 20.   In this way, Plaintiffs attempt to fashion an exception for hypothetical tort liability; no causes of action apart from the NMED Notice have arisen from the alleged property damage in this case.

The Tenth Circuit declined to adopt this line of reasoning in *Chisholm's* and found that actual, not conceivable, tort liability was required to trigger an analogous alternative liability

16

provision in that case. *See Chisholm's*, 2025 WL 1178099, at *10. The Court observed that in the apparently lone published American opinion to interpret a similar provision, there was evidence of actual tort allegations against the insured, prompting the court in that case to construe an exception to the pollution exclusion for common law liability based on property damage due to an oil spill. *Id.* (citing *Clean Harbors Env't Servs., Inc. v. Boston Basement Techs., Inc.*, 916 N.E.2d 406, 408 (Mass. App. Ct. 2009)). The Court found that "[u]nder that interpretation of the exception" it was "unambiguous that the exception d[id] not apply" where there was no "common law claim or request for common law damages arising from the CERCLA complaint." *Id.* Indeed, the Court observed that "the liability Chisholm's faced derived *solely* from the assertion that Chisholm's was liable under CERCLA." *Id.* (emphasis added).

The Court finds the Tenth Circuit's reasoning persuasive and to compel a similar conclusion in this case. On this record, no evidence of actual – or threatened – common law claims against Fetherolf has been presented. Plaintiffs' argument is thus predicated on the NMED Notice's finding of a "*risk* of 'vapor intrusion' into nearby structures or utility infrastructure, including, *potentially*, on the property of others" and Firm Two's finding of "a release of TCE and PCE beyond the boundaries of the facility and in the groundwater." Doc. 55 at 20; *see id.* ("Because the releases at issue impact other properties they could subject West Mesa or Fetherolf to common law liability for nuisance or trespass, independent of any NMED demand or suit to respond [sic] the effects of the PCE release."). But neither a "risk" of a pollutant's impact on neighboring structures, nor evidence of the dispersal of a pollutant beyond one's property supports actual tort liability so as to trigger the Alternative Liability Provision. Like in *Chisholm's*, here, the only actual liability Fetherolf faces flows from the NMED Notice, damage which, as explained, is unambiguously excluded from coverage by the Absolute Pollution Exclusion.

Settled New Mexico law supports the Court's prediction that the New Mexico Supreme Court would not impose a duty to defend or indemnify for hypothetical liability. "While an insurer has a duty to defend where it knows of unpleaded facts that bring a claim within a policy's coverage, it would seem to go without saying that an insurer can be under no obligation to defend against a theoretical 'claim' based on facts that are neither known to the insurer nor pleaded in the complaint." *Liberty Mut. Fire Ins. Co. v. Lyons*, 489 F. Supp. 3d 1242, 1253 (D.N.M. 2020) (applying New Mexico law), *aff'd*, No. 20-2152, 2021 WL 4592269 (10th Cir. Oct. 6, 2021). As the New Mexico Supreme Court has held, "[t]he alleged facts [must] tend to show an occurrence within the coverage." *Am. Emp. Ins. Co. v. Cont'l Cas. Co.*, 512 P.2d 674, 676 (N.M. 1973) (quoting 1 Long, The Law of Liability Insurance § 5.02 (1973)). No such facts have been alleged here. Therefore, the Court grants summary judgment as to State Farm's claim that the Absolute Pollution Exclusion provides a complete bar to defense or indemnity coverage arising from the Notice.

### E. WHETHER STATE FARM IS ENTITLED TO RECOUP DEFENSE COSTS PAID UNDER A RESERVATION OF RIGHTS

Having determined that the Policy's Absolute Pollution Exclusion precludes coverage for damages arising from the Notice, the question remains whether State Farm is correct that it may recoup "defense costs" it has already expended on Fetherolf's behalf under the reservations of rights in State Farm's November 2023 and April 2024 letters. Mot. at 17–18; Doc. 59 at 7–8. Plaintiffs assert that New Mexico does not recognize a right of reimbursement, and in any event, State Farm did not reserve a claim for reimbursement in its letters or its counterclaim filed with this Court. Therefore, even if the right exists under New Mexico law, Plaintiffs assert that State Farm has waived any entitlement to this remedy. Doc. 55 at 17.

18

Recall the relevant facts. On October 3, 2023, Fetherolf notified State Farm of its claim for defense in the NMED proceeding and for indemnity benefits. Ex. 8. State Farm responded by way of a November 16, 2023, letter, reserving its right under the Absolute Pollution Exclusion to "disclaim coverage should it be determined the policy does not apply and there is no duty to defend or pay any judgment or settlement for any of the reasons noted above, or for other reasons that may become known . . . ." Ex. 9. On January 17, 2024, State Farm notified Fetherolf that it had "completed [its] investigation into coverage on the claim being pursued by the [NMED]" and would "accept Fetherolf's tender." Ex. 10. The January letter further agreed to keep Plaintiffs' chosen counsel on the case and to accept its billings as of October 3, 2023. Then, on April 29, 2024, State Farm endeavored to amend and supplant the November 2023 letter by tacking on, in addition to the bar to coverage effected by the pollution exclusion, a defense based on exclusions for property "owned by the insured" and "reserv[ing] [its] rights as to reimbursement of any investigative or remediation expenses made as voluntary payments without [its] consent." Ex. 11.

Perhaps recognizing that there is a paucity of New Mexico law addressing the right of recoupment by the insurer under a reservation of rights, State Farm rests its hat on an opinion of this Court interpreting New Mexico law to carve out a right of restitution for payments made by insurers due to a mistake of fact. *Millers Mut. Fire Ins. Co. of Texas v. Stuart L. Stein, P.A.*, No. CIV 99-1066 LCS, 2000 WL 36739758 (D.N.M. July 24, 2000) (citing *Aetna Life Ins. Co. v. Nix*, 512 P.2d 1251, 1253 (1973)). That case has minimal application to the case at hand, however, because State Farm was not mistaken in fact when it agreed to defend Fetherolf. [6]

---

[6] In *Aetna*, the insurer paid the insured based on an inaccurate representation of the facts of the underlying claim. 512 P.2d at 1253. Here, State Farm does not dispute that it was presented with an accurate account of the damages arising from the Notice. The question on which State Farm eventually reached a negative determination was one of contract. Ex. 9 ("Based on our

The Court is aware of only two cases to address a similar question under New Mexico law. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Dean Baldwin Painting, Inc.*, 2006 WL 8444093 (D.N.M. 2006); *Resure, Inc. v. Chemical Distributors, Inc.*, 927 F. Supp. 190 (M.D. La. 1996) (applying New Mexico law).  In *National Union*, this Court predicted that New Mexico courts would opine that an insurer cannot recover defense costs already paid, based on a unilateral reservation of a right to do so, in the absence of a contract term allowing for that right.  2006 WL 8444093, at *2.   A decade earlier, another federal court interpreted New Mexico law and found that a reservation letter proclaiming a reimbursement right was sufficient to entitle the insurer to recover defense costs paid prior to a judicial determination that there was no duty to defend. *Resure, Inc.*, 927 F. Supp. at 194.

Outside this sparse sample, courts are divided as to whether an insurer is entitled to reimbursement of defense expenditures under a reservation of rights upon a judicial determination of no coverage.  Under one view, "[w]hen an insurer conditions payment of defense costs on the condition of reimbursement if the insurer had no duty to defend, the condition becomes part of an implied in fact contract when the insured accepts payment."  *United National v. SST Fitness Corp.*, 309 F.3d 914, 921 (6th Cir. 2002); *see also Evanston Ins. Co. v. Aminokit Labs., Inc.*, No. 15-cv-2665, 2017 WL 4350363 (D. Colo. July 5, 2017) (applying Colorado law); *Gotham Ins. Co. v. GLNX, Inc.*, No. 92-cv-6415, 1993 WL 312243 (S.D.N.Y. Aug. 6, 1993) (applying New York law); *First Fin. Ins. Co. v. Scotch 80's Ltd., Inc.*, No. 08-cv-862, 2010 WL 11579020 (D. Nev.

---

review of the claim, there is a question whether State Farm . . . is obligated to defend or indemnify you for claims or damages arising out of the allegations made by the [NMED]."); *cf. Aetna*, 512 P.2d at 1253 ("Whether fraudulently or innocently, [the claimant] did represent to Aetna that her husband's injury was not related to his employment. These representations induced Aetna to make payments. An insurer that has made a payment under an erroneous belief induced by a mistake of fact that the terms of the contract required such payment is entitled to restitution from the payee.").

Mar. 10, 2010) (applying Nevada Law); *Am. Econ. Ins. Co. v. Aspen Way Enters., Inc.*, 2015 WL 7871337 (D. Mont. 2015), *aff'd on other grounds*, 695 F. App'x 194 (9th Cir. 2017) (applying Montana law). The alternate view accords with *National Union* in that an insurer may not unilaterally change or supplement the terms of an insurance policy by way of a reservation of rights. *See, e.g.*, *Gen. Agents Ins. Co. of Am., Inc. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1104 (Ill. 2005); *Med. Liab. Mut. Ins. Co. v. Alan Curtis Enters., Inc.*, 285 S.W.3d 233 (Ark. 2008); *Cont'l Cas. Co. v. Winder Labs., LLC*, 73 F.4th 934 (11th Cir. 2023) (applying Georgia law); *Evanston Ins. Co. v. Bosski, Inc.*, No. 14-cv-227, 2017 WL 1158245 (D. Idaho 2017) (applying Idaho law).

What emerges as a common thread in the former line of cases (concluding that the insurer may reserve a reimbursement right lacking in the policy) is an express intent to reserve that right. *Cf. State Farm Mut. Ins. Co. v. Coker*, 505 F. App'x 824 (11th Cir. 2013) (applying Florida law) (insurer was not entitled to reimbursement where its reservation of rights contained no reservation of a right of reimbursement). Nowhere in State Farm's three letters concerning its agreement to defend Fetherolf does State Farm proclaim such an intent and neither party contends that the Policy supplies this right.[7] An implied in fact contract cannot exist where there is no indication that State Farm presented Fetherolf with its preferred terms.

Further, it must be recognized that in New Mexico, the duty to defend is broader than a duty to indemnify. The duty to defend arises at the time the insurer receives notice of a claim possibly covered by the relevant policy and exists until a definite no coverage determination is

---

[7] Indeed, the January 2024 letter appears to suggest that State Farm reached an unconditional and final determination that it would accept Fetherolf's legal bills. After four months of silence, State Farm for the first time invoked a "reimbursement" right but in connection with "investigative or remediation expenses" based on the voluntary payments clause. Exs. 10, 11.

made.  *See D.R. Horton, Inc. v. Trinity Universal Ins. Co.*, 553 P.3d 463, 476 n.1 (N.M. Ct. Ap. 2024); *State Farm Fire and Cas. Co. v. Price*, 684 P.2d 524, 528 (N.M. Ct. Ap. 1984). Therefore, a later judicial determination in the insurer's favor does not negate an earlier duty to defend.

Moreover, notwithstanding that the insurer in *National Union* had expressly included a reimbursement right in its reservations and had issued notice of its reservations concurrent with its agreement to undertake a defense, this Court, applying New Mexico law, still declined to award attorney's fees already paid.  *See* 2006 WL 8444093, at *1, 3. Thus, even if the New Mexico Supreme Court were to recognize a reimbursement right in similar cases, the Court predicts that it would not hold that such a right may be implicitly reserved.  The Court therefore declines to hold as a matter of law that State Farm is entitled to recoup defense costs incurred prior to this Court's Order.

## F.  WHETHER THE VOLUNTARY PAYMENTS CLAUSE ENTITLES STATE FARM TO REIMBURSEMENT

In addition to seeking recoupment of defense costs, State Farm appears to seek reimbursement for payments made based on Plaintiffs' investigation and remediation efforts predating Plaintiffs' notice of claim.  Mot. at 17–18.  State Farm asserts Plaintiffs violated the Voluntary Payments Clause, which provides, under the heading "Insured's Duties in the Event of Occurrence, Claim or Suit," that "No insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."  Ex. 7 at 68.  In its April 29, 2024, letter (issued five months after its agreement to accept Fetherolf's tender), State Farm reserved its right under this clause "as to reimbursement of any investigative or remediation expenses" without its consent.  Ex. 11.  State Farm contends that any payments Plaintiffs made before the October 3, 2023, notice of claim were voluntary and that State Farm is under no obligation to cover them.  But that clause cannot bear the weight State Farm

seeks to place on it, and as predicted herein, the New Mexico Supreme Court would not permit a reservation of rights letter to add terms non-existent in the insurance contract between the parties. Should State Farm have desired to retain a reimbursement right for payments made voluntarily, it was free to include that in its policy. *Lewis v. Dairyland Ins. Co.*, 831 P.2d 985, 988 (N.M. 1992) ("[The court] will not rewrite the parties' contract.").

## CONCLUSION

THE COURT therefore **GRANTS** the Motion for Summary Judgment [Docs. 43, 44] as to Defendant State Farm's claim that the Absolute Pollution Exclusion bars indemnity and defense coverage under the Policy.  The Court **DENIES** the Motion to the extent that it seeks a declaration that State Farm is owed reimbursement of defense or indemnity expenditures already made.

**IT IS SO ORDERED.**


/s/

_____
WILLIAM P. JOHNSON
SENIOR UNITED STATES DISTRICT JUDGE